FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA** 02 SEP 25  AM 10: 02
**NORTHEASTERN DIVISION**

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| LEVERN GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 00-JEO-3494-NE |
| | ) | |
| PITTSBURGH PLATE & GLASS | ) | **ENTERED** |
| COMPANY, | ) | |
| | ) | **SEP 2 5 2002** |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, the plaintiff, Levern Green (hereinafter "Green"), a former employee of the

defendant, Pittsburgh Plate and Glass Company[1] (hereinafter "PPG"), asserts that he was the

victim of race discrimination and retaliation when the defendant failed to provide him with

certain salary continuation benefits and when PPG terminated him, all in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e (hereinafter "Title VII") and 42 U.S.C. §§ 1981

and 1981a. PPG has filed a motion for summary judgment on all claims. (Doc. 13). The

defendant has also filed a motion to strike limited portions of the plaintiff's deposition testimony.

(Doc. 23). Upon due consideration, the court finds that the motion for summary judgment is due

to be granted and the motion to strike is due to be granted in part and denied in part as stated

more fully herein.

## I. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to

---

[1] The defendant's correct name is PPG Industries, Inc.

*29*

interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id*.

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

2

case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all

3

justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant

need not be given the benefit of every inference but only of every reasonable inference. *Brown v.*

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ

on the inferences arising from undisputed facts, then a court should deny summary judgment."

*Allen*, 121 F.3d at 643.

### B. Facts[2]

#### 1. Background

Green began working at PPG's facility in Huntsville, Alabama, in May 1985. (Green

Depo. at 23-24).[3]  PPG manufactures and refurbishes aircraft windshields and specialty glass at

its plant in Huntsville. (Divasto Aff. at ¶ 3).[4]  In April 1996, Green filed an EEOC charge along

with other persons challenging, among other things, the promotional practices of PPG.  In April

1999, a discrimination lawsuit was filed in the Western District of Pennsylvania. (*Elbert Drake*

*v. P.P.G.*).  Green was deposed in that litigation on March 13, 2000. (Doc. 15, Ex. 7).  George

Ellis, the plant manager, told Green during a union campaign in 1999 that he "had a list of those

people that was [sic] on the *Drake* litigation and they would be dealt with." (Green Depo. at 95,

103).  Ricky Jones, another employee at PPG and a co-plaintiff in the *Drake* litigation described

the incident, stating that "George Ellis got pissed off.  He got up and started yelling." (Jones

_____

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] Green's deposition is found at document 15, exhibit 6.

[4] Divasto's affidavit is found at document 15, exhibit 1.

Depo. at 230-32).[5]

On June 3, 1999, Green began an eleven day absence. (Divasto Aff. at ¶ 12; Doc. 21, Ex. 18, p. 7). On June 7, 1999, Green was treated by Dr. Benjamin Fail for a Lumbar disc strain and muscular skeletal pain in his right elbow and left shoulder. (Doc. 21, Ex. 3). Green requested compensation pursuant to PPG's Salary Continuation Plan (hereinafter "the Plan").[6] On June 12, 1999, Green authorized Dr. Fail to release his medical records to Kaye Carlton, PPG's plant nurse. (Doc. 21, Ex. 4). PPG did not receive his completed paperwork within fourteen days of when he commenced his June 3, 1999 absence. (Divasto Aff. at ¶ 12). Dr. Fail submitted an "Attending Physician Statement" dated July 9, 1999, in support of the plaintiff's claim. (Doc. 21, Ex. 3). Green ultimately was paid for the eleven days he was out. (Doc. 21, Ex. 18, p. 7).

Green commenced a three month absence[7] beginning June 16, 1999. Green did not provide PPG with the requisite paperwork within the required fourteen days. (Divasto Aff. at ¶ 12). He was given "full pay" salary continuation benefits from July 5, 1999, until August 29, 1999.[8] (Id. at Ex. H). On August 26, 1999, Dr. Fail authorized Green to work half-days. (Doc. 21, Ex. 5). He worked a few half days and was paid the other half for each under the Plan. (Divasto Aff. at Ex. H).

Two weeks later, about September 10, 1999, Green was unable to work due to

---

[5] Jones's deposition is found at document 21, exhibit 35.

[6] PPG's Plan allows an employee who is absent from work to apply for and receive certain benefits for up to one year. (Green Depo. at Ex. 3; Doc. 21, Ex. 4). The Plan requires a verification of the disability that caused the absence from work. (Id.). The verification form for benefits must be returned to PPG within fourteen days from the date of the absence. (Id.).

[7] To be exact, the period was 83 days. (Doc. 21, Ex. 18 at 7).

[8] The payroll records for the individual weeks demonstrate that the checks for a particular week were issued approximately five days after the pay period ended. (Doc. 15, Ex. H).

5

depression. (Doc. 21, Ex. 6). On October 4, 1999, the defendant received an "Attending Physician Statement" from Dr. Fail. (Doc. 21, Ex. 5). Green was given partial or full salary continuation benefits for the hours he could not work from then until October 17, 1999. (Divasto Aff. at ¶ 12 & Ex. H). Dr. Fail authorized Green to return to work on October 18, 1999. (Doc. 21, Ex. 5). According to Divasto, while Green was absent from work during September, "PPG only received non-Salary Continuance paperwork." (Divasto Aff. at ¶ 12). She contacted Green on several occasions by telephone or letter, requesting the paperwork for his salary continuance benefits. (*Id.*).

On November 4, 1999, Green was admitted to Huntsville Hospital due to a "major depressive disorder, severe without psychosis and alcohol abuse." (Doc. 21, Ex. 6). The treating physician, Dr. Scariya Kumar, stated that Green was not able to work and he recommended that Green not return to work until February 1, 2000. (Doc. 21, Ex. 7 & 36). Dr. Kumar noted on December 22, 1999, that Green was suffering from "depression, recurrent, severe alcohol abuse." (Doc. 21, Ex. 7). PPG requested to review Green's medical file. (Doc. 21, Ex. 8 & 9). Green authorized the release of his records to Carlton. (*Id.*). The records were reviewed by Kurt Loring, the then Director of Human Resources. (Loring Aff. at ¶ 3a).[9] Loring determined from his review of the records that Green had told his doctor that he used illegal drugs. (*Id.*).

Green sought benefits under the Plan for the period from October 4, 1999, to January 26, 2000.[10] (Divasto Aff. at ¶ 12). On or about December 13, 1999, Dr. Kumar submitted a Salary Continuation form to PPG. (*Id.* at ¶ 3; Doc. 21, Ex. 8). A review of the medical records

---

[9] Loring's affidavit is found at document 15, exhibit 3.

[10] It appears that he made a request for certain benefits on or about October 29, 1999. (Green Depo. Ex. 5).

6

submitted by Dr. Fail on December 14, 1999, by PPG's doctor, Dr. Jeffrey Garber, did not, at

least at that point, support an award of benefits.  Garber stated:

> Based on [the records submitted by Fail], there is no evidence to support any of
> the absences from 8/9/99 to the present time based on these office notes.  The
> notes do not address this patient being away from work.  The medications
> prescribed do not prohibit the employee from working his regular job.  The
> physician's order for a C-T scan of the head mentioned in Dr. Fail's 10/13/99 note
> could possibly warrant a one day absence for that particular test.

(Divasto Aff. at Ex. H).  PPG, however, did not receive any medical records to substantiate his

absences from October 4, 1999, until January 12, 2000.  (*Id*. at ¶ 12).

On January 26, 2000, PPG sent a letter to Green.  It stated as follows:

> Over the last 7 months you have had a convoluted history of absences from work.
> In fact, during the last six months of 1999, you were absent from work 97%.  On
> June 9, 1999 PPG mailed you Salary Continuance forms regarding your absences
> that started on June 3, 1999.  We again mailed you additional forms on June 18,
> 1999 asking you to document your illness.  On June 30, 1999 since you had not
> responded to our requests, I mailed you a personal letter asking for your
> compliance.  PPG heard nothing from you after June 3, 1999.  Finally on July 12,
> 1999, we did receive forms for your absence-over 30 days after our initial request.
> The Salary Continuance form states that the forms must be submitted to the
> Huntsville plant within 14 days of absence for a disability making you unable to
> perform your job.
>
> During the month of August you reported a myriad of issues to the nurse that
> resulted in the nurse scheduling you to see the company doctor.  On August 12,
> 1999, the company doctor saw you and reported that you should return to work the
> following week after seeing your doctor.  When you did not return to work, I
> mailed you a letter on August 23, 1999 asking that you substantiate your
> continued absence.  We received your completed Salary Continuance forms on
> August 26 with a return to work of August 30, 1999 at half days.  You worked one
> week and reported off again requesting Salary Continuance.
>
> On October 4, 1999, PPG scheduled you to see a company doctor to review your
> case since no completed forms were submitted to PPG for the month of
> September.  After medical review, the company doctor saw no reason why you
> could not return to work with no restrictions.  Our company doctor even called
> your personal physician to clarify any mitigating circumstances.  On that same

7

day, we received a fax from your doctor stating that you could work half days for two weeks and then proceed to full duty. On October 4, 1999, your first day back, you were told that you would be required to work full days per the company doctor's medical opinion of your case. You refused to work full days citing your doctor's restrictions of half days for two weeks. As a result we had you sign a medical release so we could review your doctor's medical records. The rest of the week you took vacation or called off sick.

The following week, on or about October 14, 1999, you again requested Salary Continuance, at which time the forms were mailed, and you were told it would be unpaid until we could verify your medical absence from your doctor. After receiving no Salary Continuance forms or medical records from your doctor, on October 22, I sent you a letter requesting the Salary Continuance forms by October 29 at 4:00 P.M. or your employment would be terminated. We received the forms at 5:05 P.M. on October 29. On November 4, 1999, we received word that you were in the hospital. Your wife kept us informed, but we did not receive forms for this illness until November 22, 1999 with a return to work date of December 9, 1999. During this entire time we constantly reminded you and your doctor that we were awaiting your medical records for which you executed a release on October 5, 1999. On December 10, 1999 you visited the plant asking that your paid Salary Continuance benefit be reinstated. I told you that until we received the missing documentation we would not consider that request. During that conversation you mentioned you felt you were being discriminating [sic] against. I clarified that we needed timely documentation to substantiate your absence, and we treat all employees the same way. I again reviewed what documentation was needed and we gave you additional Salary Continuance forms. On December 14, 1999 we received a fax from your doctor providing medical notes for your treatment outlined in the medical release dated October 5, 1999. It was not until January 12, 2000 that we received any additional forms from your physician. From that date, and to the present, I have been obtaining medical opinions from our doctors regarding your treatment and have requested from your most recent doctor, more medical information regarding your absence in November.

After reviewing the facts involved in this case, PPG has determined your absences from work on October 11 through November 3, 1999 and from November 9, 1999 through the present are not eligible for payment under the Salary Continuance Policy. For the period of November 4 through November 8, 1999 PPG will be releasing pay since you seemingly may have satisfied the requirements of Salary Continuance. This will be paid as a lump sum the week of January 30.

You are scheduled for a return to work physical on January 27. The appointment is with Dr. Garber and is set for 2:00 P.M. at PPG's Huntsville plant. At that time

please bring any medical records you wish Dr. Garber to consider while
determining your medical restrictions.  Failure to keep this appointment could
result in your termination of employment with PPG Industries, Inc.

(Green Depo., Ex. 5).

Ultimately, as noted in the January 26, 2000 letter, Green was found to be eligible for

benefits for the period of November 4-8, 1999.  (*Id.*, Ex. H).  He was paid the money on January

30, 2000.  (*Id.*).

Green returned to PPG on January 27, 2000.  He signed a "Rehabilitation Agreement," in

which he acknowledged that he had a problem with the use of illegal drugs and alcohol.  (Doc.

21, Ex. 12).  He also agreed to attend a rehabilitation course at the New Horizons Recovery

Center, commencing February 2, 2000.  The agreement provides, in part, that Green "understands

that failure to comply fully with treatment and fulfill each and every requirement of the treatment

plan will result in immediate termination of employment."[11]  (*Id.*).  It further states, "Any future

violation of PPG policy including its Alcohol, Drugs and Other Intoxicants Policy, any future

positive screening result, or failure to comply with [the foregoing] may result in immediate

termination. . . ."  (*Id.*).[12]  According to Green's testimony at his deposition, he did not read the

_____

[11] Although Green's specific treatment "plan" is not a part of the record, the parties agreed at oral argument in this
matter that one of the requirements of the program is that he not use controlled substances.

[12] PPG's drug and alcohol policy provides as follows:

> Reporting to work or being "on the job" under the influence of an intoxicant or intoxicants to the
> extent that performance is negatively affected is also misconduct and will result in disciplinary action
> including discharge.
>
> The impact of drug usage on health and behavior may cause poor or unsafe job performance.  Since
> health and work effectiveness are interrelated, the Company will encourage appropriate treatment when an
> employee has recognized such a need and has resolved to seek assistance.  A decision to terminate
> employment in case of drug usage may be postponed while other solutions are being actively sought and
> implemented, but such a decision may be made if management has determined that the employee has failed to
> return to satisfactory job performance and
>
> 1.      Treatment modalities have been unsuccessful; or

agreement when he signed it.  (Green Depo. at 31).

Green agreed to go to rehabilitation.  The intake summary that was completed at his initial visit to the Recovery Center states that he "appeared open to treatment and acknowledged his addiction."  (Doc. 21, Ex. 30).  When asked about stressors in his life, Green stated that one such stressor was the fact that his "boss acknowledges that his family has a long [history] in the KKK."  (*Id.*, p. 6).  Green also stated during his deposition that his supervisor, Randy Frazier, talked about "Klan stuff" and "what his position was with the Klan."  (Green Depo. at 124-25).  At another point in his deposition, Green stated that a coworker, Damon Bell stated at some unspecified time that "[w]e are going to get rid of all y'all."  (*Id.* at 123).  Bell also frequently "used the N-word."  (*Id.*).

Green took a drug test on February 11, 2000.  It did not reveal the presence of any illegal drugs.  (Doc. 21, Ex. 13).  His initial reviews on February 14 and 17, 2000, stated that he was participatory in group discussions.  (Doc. 21, Ex. 14 & 15).  The February 25, 2000 progress notes reflect that he missed a session on February 21, 2000, but provided a letter from his treating physician excusing the absence.  (Doc. 21, Ex. 16 & 17).  Dr. Kumar stated that Green was prevented from attending the classes due to "personal pressure."  The progress notes also reflect that Green lacked insight as to the harmful effects of marijuana.  (Doc. 21, Ex. 16 & 17).

On February 29, 2000, Loring sent Mike Jones at the New Horizons Recovery Center a

---

<div style="margin-left:2em">

2.      The employee refuses to obtain medical and/or other assistance
         in coping with a drug problem.

      Management has concomitant obligations to protect the safety and health of other employees and to
safeguard Company property.  These obligations may require an employee to be placed on unpaid leave or
disciplinary layoff as an interim solution until treatment is effected.

</div>

(Doc. 21, Ex. 11).  The policy further provides for intoxicant testing.  (*Id.* at 2).

letter stating that he noted that Green had missed the February 21, 2000 session and that his doctor had provided an excuse. (Loring Aff., Ex. E). Loring further stated that Green was not to miss any further sessions unless an "absolute emergency." (*Id.*).

Green also missed a class on February 28, 2000. Dr. Kumar again provided him with a letter stating that the reason for missing was "personal pressure." (*Id.* at Ex. 20). Green next missed the March 2, 2000 group session. (Loring Aff. at Ex. F). The progress notes for the week ending March 2, 2000, state that Green "doesn't seem to be giving very much insight into his addictive behavior & tends to rationalize his drug problem." (Loring Aff. at Ex. F).

After Loring received notice that Green missed two sessions, he decided to terminate Green. (Loring Aff. at ¶¶ 6-7). He told George Ellis of the decision and asked him to sign a letter informing Green of the decision. (*Id.* at ¶ 7). Loring asked Ellis to sign the letter he prepared because Green "had made statements on or about January 27, 2000, that [he] took to be a threat of physical violence." (*Id.*). Loring was concerned for his personal safety and felt that it would be better for someone else to sign the termination letter that he prepared. (*Id.*). On March 7, 2000, Ellis sent Green a letter stating that he missed two group sessions and, therefore, he was terminated from PPG, effective that day. (Doc. 21, Ex. 19). Green was informed of his right to appeal the decision. (*Id.*).

On the same day, Green tested positive for the use of cocaine.[13] (Doc. 21, Ex. 21). According to the Weekly Progress Summary dated March 10, 2000, Green reported in his group therapy session that he had used cocaine on March 8, 2000, as well. (*Id.*). The summary further

---

[13] The parties agree and acknowledge that Moore was unaware at the time he decided to terminate Green that Green tested positive for the use of cocaine.

11

states, "Client continues to minimize his problems with marijuana. Displays poor insight into the disease concept. Also, in Thursday group he was given drug screen & soon after he admitted using drugs on 3/3/00 after group." (Doc. 21, Ex. 21).

Green appealed the decision to terminate him. After reviewing the rehabilitation agreement and the progress reports for March 3 & 10, 2000, and after interviewing Green, Robert Moore, PPG's General Manager, affirmed Loring's termination decision. (Moore Aff. at ¶¶ 7-9).[14] Moore found that, although Green "contended that he had tested positive when tested on March 7 because of the letter he received that day, [Moore] determined that the test measured a time before March 7 and before he could have received the letter, and [he] determined that regardless of the foregoing, he had missed treatment, and had tested positive, either of which alone supported termination, and either of which alone was sufficient for [him] to affirm the termination." (*Id.* at ¶ 11.h).

PPG issued the defendant benefits under the Salary Continuation Plan on March 12, 2000, in the amount of $3,594.68, for the period of January 28, 2000, through March 7, 2000. (Divasto Aff. at Ex. H).

Green filed his EEOC charge in this matter on April 4, 2000, claiming race, disability, and retaliation discrimination in his termination and in the denial of paid leave. (Green Depo. at 138 & Ex. 17). The EEOC investigator found insufficient evidence to believe the charge that he was discriminated against. (*Id.*, Ex. 10, p. 2).

Green continued in the treatment program and completed it in January 2001. (Doc. 21, Ex. 23).

---

[14] Moore's affidavit is found at document 21, exhibit 2.

## II. MOTION TO STRIKE

PPG has moved to strike portions of the plaintiff's deposition on various grounds. Initially, PPG asserts that certain portions contain inadmissible hearsay. First, Green states that he is aware that his physician submitted letters to PPG excusing his absences from the mandatory sessions at New Horizon because his physician told him he sent such letters. (Green Depo. at p. 50, lines 17-21). This testimony is hearsay and is due to be excluded.

Second, Green asserts that he was told by another employee that he tested positive for the use of cocaine, but was not terminated. (Green Depo., p. 103, lines 21-23 and pp. 104-05). This testimony constitutes hearsay and is due to be excluded.

Third, Green asserts that Melvin Jones tested positive for the use of alcohol, everyone knew he had a problem with alcohol, and he was allowed to retire early rather than being terminated. (Green Depo., pp. 107-12). However, he also stated that he did not see Jones's test results, but based his assessment on his observations and conversations with Jones and other employees. To the extent that Green's testimony is premised on things he heard and his conclusion that "everybody knew Melvin Jones had an alcohol problem," the testimony is due to be stricken.[15]

Fourth, Green states that another individual named Ken had alcohol problems that were ignored by his supervisor. (Green Depo., pp. 112-14). It is evident that this statement is premised on Ken telling Green that he had a problem. The evidence that Ken's supervisor ignored the information is premised on a statement from some supervisor in the plant. Without

---

[15] This evidence is due to be struck as conclusory because Green presented no evidence demonstrating how he knew that Jones tested positive for the use of alcohol while at work.

more, this evidence is due to be struck as hearsay.

Fifth, Green states that another black employee named Roy was terminated for his substance abuse problem. (Green Depo., p. 119). When questioned as to how he knew this, Green stated, "You just hear things around the plant." (*Id*.). This testimony is due to be struck.

Sixth, Green states that he knew that Ellis played a role in terminating him because "it was just things that was [sic] out there," and "[t]here was some things that was said about George [Ellis] that him and Kurt [Loring] were hand in hand about those individuals that he was out to get, was going to get." (Green Depo., pp. 128-29). This testimony is not premised on any first-hand information. (*Id*., pp. 128-34). It is not admissible.

PPG next asserts that certain testimony is irrelevant and, therefore, not admissible under FED. R. EVID. 402. First, Green references Frazier's statements concerning the KKK. Any statements attributed to Frazier concerning the KKK are not relevant because he is not a decision-maker with regard to Green's benefits and termination. There is no evidence that the decision-maker was aware of the statements.

Second, Green asserts that his drug use was at least, in part, a result of PPG's denial of benefits. (Green Depo., p. 42). This statement is not relevant to the issues before the court on the motion for summary judgment.

Third, Green states that Ellis had a list of employees that would be "dealt with" and that he (Ellis) made comments regarding these employees. (Green Depo., pp. 89, 91, 94, 97 & 126). Because the evidence fails to demonstrate that Ellis had a decision-making role in the decision to deny Green's benefits or to fire him, the statements are irrelevant.

Fourth, Green states that Damon Bell, a co-worker, used the "N-word." Because Bell was

14

not a decision-maker, this testimony is irrelevant.

Fifth, PPG objects to Dr. Kumar's letter of March 1, 2000, concerning Green's absence from his group counseling session on February 28, 2000, because it was not received by PPG and not known to Green. The motion is due to be denied as to this exhibit, but gives its appropriate weight.

PPG next asserts that certain portions of Green's deposition are due to be stricken because they are speculative and not based on Green's personal knowledge. First, Green states that "nobody else had to go through this same process" to obtain his salary continuation. (Green Depo., p. 42). PPG asserts that this statement is due to be struck due to the fact that it is without foundation. The court agrees. There is no demonstration that this statement is supportable.

Second, Green states that there were "other employees" who were receiving salary continuation with less of a basis than he was. (Green Depo., p. 43). PPG asserts that this statement is likewise without foundation. The court again agrees.

Third, Green states that his psychiatrist wrote letters excusing his absences from treatment sessions. (Green Depo., pp. 4, 49, 50-51, & 81). To the extent that he asserts the letters were "submit[ted]," the defendant lacks first-hand knowledge of that fact. Accordingly, that portion of his statement will not be considered by the court.

Fourth, Green states that there was an incident where a noose was displayed at PPG. (Green Depo., pp. 151-54). He also candidly admits that he did not see it. (*Id.*, p. 155). Accordingly, this testimony is due to be stricken.

PPG next objects to certain portions of his deposition as being nonresponsive. First, PPG objects to the following:

15

Q.  . . . .  Are you aware, Mr. Green, that PPG, that New Horizons reported to PPG that you were absent for sessions February 21st, February 28th and March 2nd, with no excuse for March 2nd?

A.  They might have not had [sic] gotten it at that time.  But every time I – sometimes you can let the – let your counselor know, you know, your whereabouts or what is going on.  And they kept records of, you know, it was their responsibility to know and that way you could continue the program.  So she was aware of what was going on as far as to my absence, now.  As far as what was produced, there was an excuse that was submitted to her or them at New Horizons, might have not been on that particular day, but there was an excuse.  She was aware of me being out by an excuse from my psychiatrist.

(Green Depo., pp. 51-52).  This answer is not responsive and will not be considered.

Second, PPG seeks to have the court strike the following answer:

Q.  . . . .  But my question is, did he [(Ellis)] say your participation in the Drake litigation was the reason for your termination?

**A.  Yes, he said those individuals that was [sic] on that would be dealt with.**

Q.  What did he say – no, sir.

MR. COLEMAN: Move to strike his [sic] nonresponsive.  This is the last time I'm going to ask before calling the judge.

Q.  Did he say that your participation in the Drake litigation was the reason for your termination?

A.  No, he did not say that.

(Green Depo., pp. 95-96)[16] (emphasis added).  That answer was nonresponsive and due to be struck.

Third, PPG moves to strike the following:

Q.  . . .  Were you present when Melvin Jones was tested for alcohol?

---

[16] The defendant moves to strike lines 3-9 on page 96, which includes Coleman's question and comment after the highlighted answer.  The court presumes, PPG is seeking only to have the court strike the bolded portion of the colloquy.

A. No, I wasn't present.  I knew the man had a problem.  It was obvious.  Everybody in the plant knew that Melvin Jones had an alcohol problem.

(*Id.*, pp. 20-23).  It is evident that PPG is requesting to strike Green's answer, not the question.

However, the answer, "No, I wasn't present," is responsive.  The remainder of the answer is not

and is due to be struck.

Fourth, during the deposition, the following occurred:

Q. Are you saying that if New Horizons' records show that you tested positive on March

7, that that's not true?

A. When I heard about what was going on at PPG, yes.

Q. No, sir, please.

A. That's right.

Q. Are you saying that is a false record, that that record is false if it says you tested positive on March 7? Yes or no?

MR. WINSTON: Wait, we object to the form of the question.

Q. You can answer.

A. I don't know.  I don't know what the question is.

MR. COLEMAN: Read it back.

(Record read.)

**A. Are we here because of me testing positive, or are we here because I was terminated for missing two group sessions?**

**MR. COLEMAN: Move to strike.**

**A. I don't understand the question.**

**MR. COLEMAN: Move to strike as nonresponsive.**

17

(Green Depo., pp. 158-59) (emphasis added).  PPG moves to strike the highlighted portion as being nonresponsive.  The only portion of the foregoing that could constitute evidence is the inquiry by Green as to whether they were there because he was terminated for missing two group sessions or because he tested positive for the use of drugs.  To the extent that the statement could possibly be offered as evidence, it is nonresponsive to the original question.

PPG next asserts that Green's certificate of completion of the substance abuse program (doc. 21, ex. 20) and the letter from Kumar (*id.*, ex. 23) are due to be struck because they are not authenticated.  (Doc. 23, p. 6).  "In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form."  *Denney v. City of Albany*, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001) (*citing Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)); *see McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (otherwise admissible evidence may be submitted in an inadmissible form at the summary judgment stage).

Although PPG is correct that the plaintiff has not properly authenticated these documents, the court has reviewed the plaintiff's evidentiary submissions and finds that the documents are otherwise admissible and could be reduced to an admissible form at trial.  Therefore, the defendant's motion to the extent it seeks to have the court strike these submissions is due to be denied.

Lastly, PPG asserts that the portion of the plaintiff's memorandum that asserts "that he provided excuses for every time he failed to attend one of his scheduled sessions" is due to be struck because it contradicts his deposition testimony "that he only knew of two letters which were offered as excuses: one for a session missed on February 21, 2000 (dated February 28,

18

2000), and another for March 7, 2000 (dated June 28, 2000)." (Doc. 23 at 8). In support of this, PPG cites to *Van T. Junkins v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

In *Van T. Junkins*, the court stated that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.*, 736 F.2d at 657. More particularly, in *Van T. Junkins*, the plaintiff brought an action against the manufacturer of prefabricated buildings to recover for alleged fraud and reckless misrepresentations in denying the plaintiff a dealership after he purchased land and a building. During his deposition, the president of the plaintiff company testified three times that there was no condition attached to his purchasing the building. *Id.*, 736 F.2d at 657. On the motion for summary judgment, the president stated in an affidavit that he had a meeting with representatives of the defendant who told him that if he would purchase one of their buildings then he would be awarded the dealership. (*Id.*). Affirming the trial court's grant of summary judgment for the defendant, the court stated:

> Under these facts as presented, we agree with the district court that the affidavit constituted a sham. When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

(*Id.*). In *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986), the court stated:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. "An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).

19

The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins*, at 657.

[E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. *See Choudhry v. Jenkins*, 559 F.2d 1085, 1090 (7th Cir.) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert. denied sub nom.*, *Indiana v. Choudhry*, 434 U.S. 997, 98 S. Ct. 634, 54 L. Ed. 2d 491 (1977). In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition. *Kennett-Murray, Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

The foregoing authorities demonstrate that the court should be cautious in rejecting testimony. Accordingly, the court does not find that the deposition testimony is due to be rejected. To the extent that the brief states that Green submitted an excuse for every absence, the court does not accept that as anything more than argument – not evidence. As is further discussed below, the court has examined the record for the evidence.

## III. DISCUSSION

### A. Generally

The plaintiff asserts that he was subjected to race discrimination and retaliation when PPG failed to provide him with salary continuation benefits and when PPG terminated him. He

presents his claims pursuant to Title VII and 42 U.S.C. §§ 1981 and 1981a. The plaintiff must

demonstrate "intentional discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450

U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The Supreme Court has stated

unequivocally that "[p]roof of discriminatory motive is critical" in a disparate treatment case.

*International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15, 97 S. Ct. 1843, 52

L. Ed. 2d 396 (1977). *See also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S.

711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983); *Carter v. City of Miami*, 870 F.2d 578, 581

(11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528-29 (11th Cir. 1983).

The plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). He

can establish a *prima facie* case under Title VII[17] by showing: (1) that he was a member of a

protected class (black); (2) that he was qualified for the position at issue; (3) that an adverse

employment action was taken against him; and (4) that the employer treated similarly situated

employees outside the protected class (white employees) more favorably. *Spivey v. Beverly*

*Enterprises, Inc.*, 196 F.3d 1309 (11th Cir. 1999); *See, e.g., Maniccia v. Brown*, 171 F.3d 1364,

1368 (11th Cir. 1999); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir.),

*superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th

Cir. 1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

If the plaintiff succeeds in establishing a *prima facie* case, the defendant only has the

burden of articulating or producing evidence, but not persuading, that the plaintiff was

---

[17] The considerations are the same for a case under § 1981. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

disciplined or terminated for a "legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 253;

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113. S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

*See also Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356 (M.D. Fla. 2001) ("If a

plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate

a legitimate, nondiscriminatory reason for the challenged employment action.") quoting

*Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)). Once the defendant

articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of

discrimination arising out of the *prima facie* case "drops from the case." *Burdine*, 450 U.S. at

255 n.10; *Hicks*, 509 U.S. at 507. The court "must, in view of all the evidence, determine

whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory

reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate

reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d

1519, 1538 (11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997)

(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). This must

include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable fact finder could find them unworthy of

credence.'" *Combs*, 106 F.3d at 1538. If it is "determine[d] that a reasonable jury could

conclude that the employer's articulated reasons were not the real reason for its decision, the

court may not preempt the jury's role of determining whether to draw an inference of intentional

discrimination from the plaintiff's prima facie case taken together with rejection of the

employer's explanations for its action." (*Id.*).

## B. Termination Claim

The defendant initially asserts that Green cannot prevail on his termination claim because he cannot establish a *prima facie* case. (Doc. 14, p. 13). It further asserts that he cannot establish that the reason articulated for his termination was not true. (*Id.*).

There is no direct evidence of discrimination in this case.[18] There is no evidence that Green was replaced by a white employee. Thus, the issue is whether there is evidence that demonstrates that similarly situated white employees were treated differently. This court must first determine what it means in this case to be "similarly situated." The court in *Maniccia* stated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia*, 171 F.3d at 1368-69. Thus, in a case such as the present one that involves employee termination, the issue is whether the other employees are "similarly situated" for comparative purposes. This will be the situation only if their conduct is "nearly identical" in relevant respects

---

[18] Although the court finds the statements by Frazier regarding his and his family's role in the KKK and Bell's use of the "N-word" troubling, these matters do not and cannot constitute direct evidence of discrimination in this case. There is no argument, much less evidence in the record, that either of these individuals were involved in the decisionmaking process concerning Green.

to that of the plaintiff.  The burden is on the plaintiff to show that similarly situated employees were not treated equally.  *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).  In making this determination, "the court must consider whether the employees involved in or accused of the same or similar conduct were disciplined in different ways."  *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1369 (S.D. Fla.), *aff'd*, 265 F.3d 1066 (11th Cir. 2001) (Table).  "'The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.'  *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir.) (quoting *Holifield*, 115 F.3d at 1562), *cert. denied*, ___ U.S. ___, 122 S. Ct. 402, 151 L. Ed. 2d 305 (2001).  We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.  *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ('Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.')."  *Maniccia*, 171 F.3d at 1368-69.

Green asserts that he has shown individuals that were treated differently by being allowed to complete rehabilitation and resume their work after testing positive at work.  (Doc. 20, pp. 12-13).  Specifically, Green correctly states that in July 2000, PPG had thirteen employees that tested positive for the use of drugs and who began rehabilitation.  (*Id.*).  Green further notes that the circumstances surrounding the two employees who were terminated for violating their rehabilitation agreements were different.

The court finds that Green has not demonstrated a *prima facie* case.  The record shows that sixteen PPG employees tested positive for the use of drugs.  (Doc. 21, Ex. 24).  Thirteen of

24

those were white employees; three were black. (*Id.*). Two of the white employees, who are identified in the record as "006" and "0011," were terminated. "006" was terminated after he tested positive following the rehabilitation sessions. (Moore Aff. at p. 5; Doc. 21, Ex. 24, 26-27, & 29). "0011" was terminated after he did not attend the rehabilitation program. (Doc. 21, Ex. 24-25 & 28). There is no evidence concerning the remaining eleven white program participants that indicates that they are similarly situated to Green in that they missed a treatment session or sessions or that they tested positive but were allowed to continue working.[19] Absent some evidence of similarly situated white employees being treated more favorably, summary judgment is due to be granted.

Assuming for the sake of argument that Green has demonstrated a *prima facie* case of race discrimination, the burden then shifts to PPG to respond with a legitimate, nondiscriminatory reason for its actions. *Combs*, 106 F.3d at 1527-28 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 92 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)). As already stated, PPG asserts that Green was discharged because he missed at least one counseling session without an excuse and because he tested positive for the use of cocaine on March 7, 2000.[20] (Moore Aff. at ¶ 11.h.). PPG having demonstrated reasons for its action, Green must now "cast sufficient doubt on the defendant's proffered nondiscriminatory reason[s] to permit a reasonable fact finder to conclude that the employer's proffered legitimate reasons [were] not what actually motivated its conduct." *Combs*, 106 F.3d at 1538.

---

[19] There is also no further explanation concerning the other three black participants in the program.

[20] Although the positive test result was not reported until March 9, 2000, after the termination letter, Moore considered the same in his review of the decision to terminate Green. (Moore Aff. at ¶ 11.h.).

25

Green asserts that PPG's "allowance of their white employees to complete a course of rehabilitation while terminating Green reflects a double standard with respect to treatment opportunities." (Doc. 20, p. 15). Accordingly, he asserts that the motion for summary judgment is due to be denied on this claim. The court disagrees. First, as already discussed, the other employees have not been shown to be similarly situated. Second, nothing in the record challenges the fact that on March 7, 2000, Loring had learned that Green had missed two scheduled group sessions (February 28 and March 2, 2000). (Loring Aff. at ¶ 7). This resulted in the March 7, 2000 termination letter. (*Id*. at Ex. H). Although the record includes a March 1, 2000 letter from Green's doctor excusing his absence due to "personal pressure," there is no evidence New Horizons received the letter before the weekly progress notes, reflecting the absences, were forwarded to Loring. Additionally, there is no evidence Loring was aware of the excuse for the February 28, 2000 absence before the termination letter. Third, the court finds no error in Moore's considering Green's failure of the drug test on March 7, 2000, even though PPG learned of it after Green was notified of his termination. Moore was not required to disregard this information in making his decision concerning the plaintiff. To require him to do so would exceed this court's authority in this matter. The court has closely examined the facts surrounding each of the purported comparators and the reasonable inferences that may be drawn therefrom and it finds that they are insufficient under *Combs* to defeat the defendant's motion for summary judgment on the termination claim.[21]

---

[21] The court is not impressed by the defendant's argument that other individuals involved in the *Drake* litigation are still employed by PPG. (*See* Loring Aff. at ¶ 9). That fact does not change the facts and circumstances concerning the treatment of Green.

### C. Benefits Claim

Green asserts that the difficulty in obtaining salary continuation benefits was a result of discrimination and retaliation. This claim is the same as the first claim in that there is no direct evidence of discrimination. Thus, the issue is whether there is evidence that demonstrates that similarly situated white employees were treated differently. Green asserts (doc. 20, ¶ 48), and the record shows (doc. 21, ex. 18), that numerous persons, black and white, received salary continuation benefits during the relevant period. Green received such benefits 26 times while he was employed with PPG, twelve of which were awarded after he filed his first EEOC charge. (Divasto Aff., ¶ 11). There is no evidence that a white employee received benefits pursuant to the Plan under circumstances that Green did not.[22] Thus, he has failed to establish a *prima facie* case.

Even if Green had demonstrated a *prima facie* case, the defendant has articulated a legitimate, nondiscriminatory reason for failing to pay certain benefits or for the delay in payment. Specifically, PPG asserts that Green did not provide it with timely paperwork and substantiation for his claims as is required under the Plan. This argument is supported by the January 26, 2000 letter from Loring to Green and Dr. Garber's notes from the review of Green's medical records. (Divasto Aff., Attachment HH). Green counters that he felt that he had done everything that he was supposed to do to qualify for the benefits. (Green Depo., pp. 149-50).

Green's subjective, conclusory opinion that he felt that he did everything he was required

---

[22] In the "Memorandum in Opposition to Defendant's Motion for Summary Judgment," Green states that the list of employees that received Salary Continuation Benefits includes five to seven white persons who were permitted to receive benefits for one year. (Doc. 20, ¶ 42; Doc. 21, Ex. 18). The court has examined the list and finds that seven persons received a full year of benefits under the Plan. Six individuals were white and one was black. (Doc. 21, Ex. 18). Another white individual, Grady Mosley, received 363 days of benefits. (*Id.*, p. 1). Lillian Warren, a black employee, received the most benefits (366 days) due to the fact that the one year included an extra day due to it being a leap year. (*Id.*, p. 5). The court fails to see how any of this evidence supports a *prima facie* case of discrimination.

to do is not sufficient to overcome the defendant's motion for summary judgment under the present circumstances. This court cannot be driven by Green's opinion of his actions, but must look to the reasonableness of PPG's perception of whether Green satisfied the requirements of the Plan. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1332-33 (11th Cir. 1998). Having conducted such an examination, the court finds that the evidence does not warrant submitting this claim to the jury for resolution.[23]

### D. Retaliation Claim

In *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001), the Eleventh Circuit Court of Appeals stated:

> In addition to prohibiting employers from discriminating on the basis of race, Title VII makes it unlawful:
>
> > for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].
>
> 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, the plaintiff must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment action. *See Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000); *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir. 1999); *Little v. United Technologies,* 103 F.3d 956, 959 (11th Cir. 1997).

Green asserts that PPG's motion for summary judgment on the retaliation claim is due to be denied because he has shown that in April 1999 he was part of the group that filed the *Drake*

---

[23] Even if the court could rely on the plaintiff's opinion, the record does not support his conclusion. This is evidenced by the fact that his deposition clearly demonstrates he had no knowledge of what records were sent to PPG or when they were sent. (*See* Green Depo. at 184-94).

lawsuit and after that he experienced difficulty with regard to his salary continuation and was not allowed to continue in the rehabilitation process as were other employees. (Doc. 20, p. 16). He also notes that Ellis, the plant manager, establishes the required causal link between the litigation and the denial of benefits and his termination.

It is evident from the record that Loring and Moore were the decision makers with regard to Green's termination. His attempt to use Ellis as the causal link to support the retaliation claim is insufficient to overcome the motion for summary judgment.

It is undisputed that Ellis merely signed the termination letter because of Loring's perceived concern over the threat purportedly made by Green. He was not involved in the decision made by Moore. The court also finds that the time periods between Green's filing of the EEOC charge (April 1996), the *Drake* lawsuit in Pennsylvania (April 1999), and the termination in March 2000 are insufficient to give rise to an inference of causation in this case as to Loring and Moore. *See Kelly v. Caldera*, 2000 WL 284263, *4 (S.D. Ala. 2000) ("However, the six-month interim between the protected conduct and the adverse employment action in this case is too long a delay to give rise to an inference of causation. *See, e.g., Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month delay between protected activity and adverse employment action insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (four-month delay insufficient to establish causal connection)"), *aff'd*, 251 F.3d 161 (11th Cir. 2001) (Table).

Additionally, the court agrees with PPG in its assessment that "even if Ellis had played a role in the decision and even if his statement had been retaliatory, this makes no difference whatsoever in the outcome" because an independent decision maker, Moore, reviewed the initial

29

decision to terminate Green, examined the facts, and reached an independent decision to terminate Green. (Doc. 22, p. 13). In support of this contention, PPG cites to *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001). In *Pennington*, the court stated that the mixed-motive defense remains good law with respect to retaliation claims. *Id.*, 261 F.3d at 1269. Accordingly, the next issue is whether PPG has shown that it would have made the same decision absent Ellis's purported bias.

The court finds no evidence that Moore was tainted either by the previous decision of Loring, the purported bias of Ellis, or by any other retaliatory animus towards Green. As stated by the Eleventh Circuit in *Pennington*, "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999) (finding that biased employee did not manipulate the final decisionmaker); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (finding that decisionmaker's employment decision was not causally related to a subordinate's discriminatory animus); *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir. 1997) ('[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant.')." *Pennington*, 261 F.3d at 1270. Accordingly, this is sufficient to warrant summary judgment on behalf of the defendant.

## IV. CONCLUSION

Premised on the foregoing, the defendant's motion for summary judgment is due to be granted and the defendant's motion to strike is due to be granted in part and denied in part. An

order consistent with the findings and conclusions reflected in this Memorandum Opinion will be entered contemporaneously herewith.

The Clerk is directed to serve a copy of this Memorandum Opinion upon counsel for the parties.

**DONE,** this ⏚ day of September, 2002.

**JOHN E. OTT**
United States Magistrate Judge